# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued December 10, 2013       Decided March 11, 2014

No. 12-1166

UTILITY AIR REGULATORY GROUP,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

EDGECOMBE GENCO, LLC, ET AL.,
INTERVENORS

———

Consolidated with 12-1366, 12-1420

———

On Petitions for Review of Final Action of the
United States Environmental Protection Agency

———

*Lauren E. Freeman* argued the cause for Industry Petitioners. With her on the briefs were *Craig S. Harrison*, *Greg Abbott*, Attorney General, Office of the Attorney General for the State of Texas, *Jon Niermann*, Chief, Environmental Protection Division, and *Mark Walters* and *Mary E. Smith*, Assistant Attorneys General. *Elizabeth L. Horner* entered an appearance.

*David B. Rivkin*, *Jr.*, *Lee A. Casey*, *Mark W. DeLaquil*, *Andrew M. Grossman*, *Lisa M. Jaeger*, *Eric A. Groten*, and *Jeremy C. Marwell* were on the brief for intervenors Edgecomb Genco, LLC, et al. in support of petitioners.

*Amanda Shafer Berman*, Attorney, U.S. Department of Justice, argued the cause for respondent. On the brief were *Robert G. Dreher*, Acting Assistant Attorney General, and *Norman L. Rave*, *Jr.*, Attorney. *Eric G. Hosteller* and *Matthew R. Oakes*, Attorneys, entered appearances.

*Pamela A. Campos*, argued the cause for Environmental Intervenors in support of respondent. With her on the briefs were *Tomás E. Carbonell*, *Shannon Smyth, James S. Pew*, *Neil E. Gormley*, *Sean H. Donahue*, *Sanjay Narayan*, *John D. Walke*, and *John T. Suttles.*

Before: GARLAND, *Chief Judge*, and ROGERS and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GARLAND.

Concurring opinion filed by *Circuit Judge* KAVANAUGH.

GARLAND, *Chief Judge*: The Utility Air Regulatory Group and the State of Texas challenge 2009 and 2012 final rules issued by the Environmental Protection Agency (EPA) under the Clean Air Act. The rules revised the new source performance standards for steam generating units. Several of the petitioners' challenges are not properly before us because they were first raised in petitions for reconsideration that remain pending before the agency. We reject the petitioners' remaining challenges and deny the petitions for review.

I

The Clean Air Act directs the EPA Administrator to publish and periodically revise a list of categories of stationary sources, which are large, fixed sources of air pollution. 42 U.S.C. § 7411(a)(3), (b)(1)(A). The Administrator must include a category of sources in this list "if in his judgment it causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare." *Id.* § 7411(b)(1)(A). Once a source category is listed, the Administrator must establish new source performance standards for that category. *Id.* § 7411(b)(1)(B).[1]

Fossil-fuel-fired steam generating units are boilers that produce electricity. In so doing, they emit particulate matter into the atmosphere. Because EPA determined that those emissions "may contribute significantly to air pollution which causes or contributes to the endangerment of public health or welfare," List of Categories of Stationary Sources, 36 Fed. Reg. 5931, 5931 (Mar. 31, 1971), it promulgated new source performance standards for those units. The regulations are divided into four subparts within 40 C.F.R. Part 60 -- Subparts

---

[1]A "new source" is "any stationary source, the construction or modification of which is commenced after the publication of regulations . . . prescribing a standard of performance under this section which will be applicable to such source." 42 U.S.C. § 7411(a)(2). A "standard of performance" is "a standard for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated." *Id.* § 7411(a)(1).

D, Da, Db, and Dc -- each of which concerns a specific group of sources.[2]

To ensure that steam generating units comply with emission limits, EPA requires that they measure the particulate matter in their emissions. When EPA initially promulgated the regulations, the only way to measure such emissions was to perform a manual test. *See* Standards of Performance for New Stationary Sources, 36 Fed. Reg. 24,876, 24,888-90 (Dec. 23, 1971). To provide an alternative (and less expensive) way to assess compliance, EPA later added opacity standards to its boiler rules. *See* Standards of Performance for New Stationary Sources: Additions and Miscellaneous Amendments, 39 Fed. Reg. 9308, 9308-09 (Mar. 8, 1974). Opacity is not a pollutant but rather can serve as a proxy for pollutants: It measures the degree to which stack emissions block the transmission of light. Opacity can be measured by (among other things) visual inspection by a trained observer or by a continuous opacity monitoring system (COMS). A COMS requires the installation of equipment in the steam generating unit's stack. This

---

[2]Subpart D covers fossil-fuel-fired electric utility steam generating units (EGUs) of greater than 73 megawatts (MW) heat input capacity, on which construction, modification, or reconstruction commenced after August 17, 1971 and on or before September 18, 1978. *See* 40 C.F.R. § 60.40(a). Subpart Da covers EGUs of greater than 73 MW heat input capacity on which construction, modification, or reconstruction began after September 18, 1978. *See id.* § 60.40Da(a). Subpart Db covers industrial-commercial-institutional steam generating units with a heat input capacity of greater than 29 MW on which construction, modification, or reconstruction began after June 19, 1984. *See id.* § 60.40b(a). And Subpart Dc covers industrial-commercial-institutional steam generating units with a heat input capacity of between 2.9 and 29 MW, on which construction, modification, or reconstruction began after June 9, 1989. *See id.* § 60.40c(a).

equipment shines a light beam through stack gases and records the resulting opacity readings at fixed intervals.

A newer form of monitoring technology is a continuous emissions monitoring system (CEMS). A CEMS, like a COMS, requires the installation of monitoring equipment in the unit's stack. But a CEMS measures pollutants directly, rather than by measuring opacity as a proxy. Both a CEMS and a COMS measure only filterable particulate matter -- which is emitted from the stack as a solid. They do not measure condensable particulate matter -- which is emitted as a gas, but turns liquid or solid upon exiting the stack. Visual inspection, by contrast, can measure both. Historically, however, only filterable particulate matter has been subject to emission limitations.

In 2006 and 2007, EPA gave facilities the option of installing particulate matter CEMS as "an alternative method to demonstrate continuous compliance and as an alternative to opacity . . . monitoring requirements." Standards of Performance [for Subparts Da, Db, and Dc Units], 71 Fed. Reg. 9866, 9867-68 (Feb. 27, 2006); *see* Standards of Performance [for Subparts D, Da, Db, and Dc Units], 72 Fed. Reg. 32,710, 32,719 (June 13, 2007). The agency said that, because particulate matter CEMS "measure the pollutant of primary interest they provide adequate assurance of [particulate matter] control device performance, and continuous opacity monitoring is an unnecessary burden to affected sources using" CEMS. Standards of Performance [for Subparts D, Da, Db, and Dc Units]; Reconsideration and Amendments, 72 Fed. Reg. 6320, 6322 (proposed Feb. 9, 2007). EPA did not, however, eliminate the opacity standards themselves; it merely said that facilities using CEMS were no longer required to install and operate COMS. *See* Standards of Performance [for Subparts D, Da, Db, and Dc Units], 73 Fed. Reg. 33,642, 33,644 (proposed June 12, 2008) [hereinafter 2008 Proposal].

In 2008, EPA published a notice of proposed rulemaking, seeking comment on the possible elimination of opacity standards altogether for facilities using CEMS. *See id.* at 33,646. The agency said that elimination of such standards at those units might be appropriate, "[s]ince opacity data has been used as a surrogate for [particulate matter] emissions and since [particulate matter] CEMS give a more direct continuous measurement of the primary pollutant of interest causing opacity." *Id.* (footnote omitted). EPA noted, however, that opacity is useful not only as a proxy for pollutants, but also "as an indicator of control device operation and proper maintenance." *Id.* at 33,646 n.1.

The 2009 final rule exempted all units using particulate matter CEMS from all opacity standards and monitoring requirements, but conditioned the exemption on their compliance with an emission standard for filterable particulate matter of 0.03 pounds per million British thermal units (lb/MMBtu) or less, rather than any otherwise applicable, higher limits. *See* Standards of Performance [for Subparts D, Da, Db, and Dc Units], 74 Fed. Reg. 5072, 5073-74 (Jan. 28, 2009) [hereinafter 2009 Rule]. For Subpart D units, for example, the higher limit was 0.10 lb/MMBtu. *See* 40 C.F.R. § 60.42.[3]

If a unit that was using a particulate matter CEMS did not comply with the lower limit, the 2009 rule required it "to either use a COMS or perform periodic visual inspections to comply with the opacity standard." *Id.* at 5074. The frequency of such inspections depended on the results of the most recent inspection. *See id.* In addition, the rule required all facilities to

---

[3]By the time of the 2009 Rule, Subpart Da units were already required to comply with the 0.03 lb/MMBtu limit, *see* 40 C.F.R. § 60.42Da (2007), as were certain, newer Subparts Db and Dc units, *see id.* §§ 60.43b(h)(1), 60.43c(e)(1) (2007).

measure and report emissions of *condensable* particulate matter. *See id.* at 5073.

UARG filed a petition for reconsideration of the 2009 rule. Among other things, it asked EPA to reconsider its decision to limit the exemption from the opacity standard and monitoring requirements to units complying with the 0.03 lb/MMBtu emission standard. EPA granted the petition for reconsideration. At the same time, it published notice of a new proposed rule. In most respects, the proposal tracked the 2009 final rule. It contained only two differences relevant here: First, EPA proposed a total (that is, filterable plus condensable) particulate matter emission limit for certain Subpart Da units on which construction, reconstruction, or modification commenced after May 3, 2011. Second, EPA proposed to add an affirmative defense to civil penalties for exceedances of emission limits that are caused by malfunctions. *See* Standards of Performance [for Subparts D, Da, Db, and Dc Units], 76 Fed. Reg. 24,976, 25,061, 25,064, 25,071 (proposed May 3, 2011) [hereinafter 2011 Proposal].

Thereafter, UARG submitted a new round of comments. It argued that EPA should exempt all Subpart D units using CEMS from the opacity standard and monitoring requirements because CEMS are sufficiently accurate to ensure compliance with emission standards. The Texas Commission on Environmental Quality also submitted comments urging EPA to revise its rules to allow steam generating units to use state-law affirmative defenses in lieu of the federal affirmative defense the agency had proposed.

On February 16, 2012, EPA issued another final rule. Standards of Performance [for Subparts D, Da, Db, and Dc Units], 77 Fed Reg. 9304 (Feb. 16, 2012) [hereinafter 2012 Rule]. The 2012 rule did not expand the exemption from the

opacity standard or monitoring requirements. *Id.* at 9424. Although it reduced the frequency of periodic visual opacity inspections for Subpart Da facilities not using COMS, *see id.* at 9457, it did not do so for Subparts D, Db, and Dc facilities, *see id.* at 9448, 9460, 9463. The 2012 rule also required certain Subpart Da units -- those on which construction, reconstruction, or modification commenced after May 3, 2011 -- to test for condensable particulate matter. *See id*. at 9458. Finally, the rule did not allow the use of state-law affirmative defenses. *Id.* at 9433.

Thereafter, UARG and the State of Texas filed petitions for agency reconsideration as well as for judicial review. EPA has not yet acted on the petitions for reconsideration. The petitions for judicial review are now before us.

## II

We begin with two issues regarding the scope of our review: the law that determines which of the petitioners' challenges are properly before us, and the standards for reviewing those challenges that are.

## A

This court's general view is that "a pending petition for [agency] rehearing . . . render[s] the underlying agency action nonfinal (and hence unreviewable) with respect to the filing party." *United Transp. Union v. ICC*, 871 F.2d 1114, 1116 (D.C. Cir. 1989); *see, e.g.*, *Clifton Power Corp. v. FERC*, 294 F.3d 108, 110-12 (D.C. Cir. 2002). In the 1990 Amendments to the Clean Air Act, however, Congress made clear that this does not apply to challenges to rules promulgated under the Act. A provision of 42 U.S.C. § 7607(b)(1) states: "The filing of a petition for reconsideration by the Administrator of any

otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review . . . ."  42 U.S.C. § 7607(b)(1).  The Senate Report accompanying the Clean Air Act Amendments confirms that the purpose of that provision was to "overrule," in the context of the Clean Air Act, the holding in *West Penn Power Co. v. EPA*, 860 F.2d 581, 583 (3d Cir. 1988), that a pending petition for reconsideration deprives an agency action of finality.  S. REP. NO. 101-228, at 3755 (1989).  *West Penn* was one of the cases upon which this court relied in adopting our general view.  *See United Transp. Union*, 871 F.2d at 1117-18.

Nonetheless, even under the Clean Air Act, a party may not raise for judicial review objections to a rule that it raised *for the first time* in a petition for agency reconsideration -- at least until that petition is resolved.  The Act states:

> Only an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment . . . may be raised during judicial review.  If the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within such time or if the grounds for such objection arose after the period for public comment . . . and if such objection is of central relevance to the outcome of the rule, the Administrator shall convene a proceeding for reconsideration of the rule . . . .  If the Administrator refuses to convene such a proceeding, such person may seek review of such refusal in the United States court of appeals for the appropriate circuit . . . .

42 U.S.C. § 7607(d)(7)(B).

The first sentence of this subsection flatly states that "[o]nly an objection to a rule or procedure which was raised . . . during the period for public comment . . . may be raised during judicial review." Standing alone, the sentence indicates that an objection raised for the first time in a petition for reconsideration may not be raised in court, because such an objection was, by definition, not raised "during the period for public comment."

The second and third sentences create a limited exception to the bar imposed by the first. As the second sentence states, if it was impracticable to raise a particular objection during the comment period or the grounds for the objection arose after that period, and if the objection is of central relevance to the outcome of the rule, "the Administrator shall convene a proceeding for reconsideration of the rule." Presumably, a party can seek judicial review of the outcome of such a reconsideration proceeding. But that sentence (together with the one that precedes it) would be pointless if a court could hear an objection raised for the first time in a petition for reconsideration before the proceeding was completed.

The third sentence indicates what a petitioner may do "if the Administrator refuses to convene" a reconsideration proceeding. In that circumstance, a petitioner "may seek review of such refusal in the United States court of appeals." And one thing the court may then do, if the predicates for reconsideration set out in the second sentence are satisfied, is vacate the refusal and direct the Administrator to convene a reconsideration proceeding. Likewise, when that proceeding is completed, the court presumably can hear a petition for review of the outcome. But once again, that sentence (together with the two that precede it) would be pointless if a court could hear a new objection before those procedural steps were completed.

In sum, although the filing of a petition for reconsideration does not render a Clean Air Act rule nonfinal for purposes of judicial review, the only objections that may immediately be raised upon judicial review are those that were raised during the public comment period. Objections raised for the first time in a petition for reconsideration must await EPA's action on that petition. *See Oklahoma v. EPA*, 723 F.3d 1201, 1214-15 (10th Cir. 2013); *see generally Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1055, 1065 (D.C. Cir. 2001); *North Dakota v. EPA*, 730 F.3d 750, 770-71 (8th Cir. 2013).

At oral argument, UARG maintained that, even if it cannot obtain judicial review of substantive challenges raised for the first time in a still-pending petition for reconsideration, it can obtain judicial review of procedural challenges raised for the first time in such a petition. But the language of the Clean Air Act forecloses that argument. *See* 42 U.S.C. § 7607(d)(7)(B) ("Only an objection to a rule *or procedure* which was raised with reasonable specificity during the period for public comment . . . may be raised during judicial review." (emphasis added)); *see also Appalachian Power Co.*, 249 F.3d at 1055; *Oklahoma*, 723 F.3d at 1214-15. Accordingly, because EPA has not yet resolved the petitioners' petitions for reconsideration, the only objections that are properly before us are those the petitioners made during the public comment periods.

B

We may vacate a final rule promulgated under the Clean Air Act if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 7607(d)(9)(A). To determine whether a rule is arbitrary or capricious, we apply the same standard of review that we apply under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A). *See Allied Local & Reg'l Mfrs. Caucus v. EPA*,

215 F.3d 61, 68 (D.C. Cir. 2000). "[W]e must affirm the EPA's rules if the agency has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Id.* (internal quotation marks omitted).

As under the APA, we may also vacate a rule under the Clean Air Act if it was promulgated "without observance of procedure required by law." 42 U.S.C. § 7607(d)(9)(D); *see* 5 U.S.C. § 706(2)(D). But the Clean Air Act tacks on three additional conditions. To vacate a Clean Air Act rule on the ground that the agency failed to observe a procedural requirement, we must also find that "(i) such failure to observe such procedure is arbitrary or capricious, (ii) the requirement of paragraph (7)(B) has been met, and (iii) the condition of the last sentence of paragraph (8) is met." 42 U.S.C. § 7607(d)(9)(D). The second condition is a reference to the requirement of § 7607(d)(7)(B), which we discussed in Part II.A above. The third condition provides that "the court may invalidate the rule only if the errors were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made." *Id.* § 7607(d)(8).

III

The petitioners raise several challenges that are not properly before us. They object to the following: the 2012 rule's condensable particulate matter testing requirement for Subpart Da units; the rule's establishment of a different frequency for periodic visual opacity inspections under Subparts D, Db, and Dc than under Subpart Da; and the agency's suggestion that it would permit the use of state-law affirmative defenses in the context of the mercury and air toxics (MATS) emission standards for coal- and oil-fired electric utility steam generating units (EGUs), issued pursuant to 42 U.S.C. § 7412, while not

allowing such defenses in the context of new source performance standards under § 7411. It is undisputed the petitioners did not make these objections during the public comment period. Although they did raise them in their petitions for reconsideration, those petitions remain pending before the agency. Accordingly, for the reasons discussed in Part II.A, these challenges are not properly before us.[4]

The following subsections address the objections that the petitioners did raise during the comment period.

A

UARG challenges the requirement -- included in the 2009 rule and reaffirmed in the 2012 rule -- that Subparts D, Db, and Dc boilers emitting more than 0.03 lb/MMBtu of particulate matter remain subject to the opacity standard and must install COMS or perform periodic visual opacity inspections, even if they use particulate matter CEMS.

---

[4]It is true that our cases have said EPA retains a "duty to examine key assumptions as part of its affirmative burden of promulgating and explaining a non-arbitrary, non-capricious rule and therefore . . . must justify [such an] assumption even if no one objects to it during the comment period." *Okla. Dep't of Envtl. Quality v. EPA*, 740 F.3d 185, 192 (D.C. Cir. 2014) (alteration in original) (internal quotation marks omitted); *see, e.g.*, *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 948 (D.C. Cir. 2004). But unlike the petitioners in the cited cases, the petitioners here did not merely fail to object to assumptions (whether "key" or not) underlying the requirements and distinctions they now challenge in court; rather, they did not object to those requirements or distinctions at all. Although the petitioners may have had good reason for not raising those objections during the rulemaking, judicial review must nonetheless await EPA's action on their petitions for reconsideration. *See supra* Part II.A; *infra* note 7.

1. UARG contends that continuing to subject boilers emitting more than 0.03 lb/MMBtu of particulate matter to an opacity standard and opacity monitoring requirements, while exempting boilers emitting that amount or less, was arbitrary and capricious. We disagree. In its 2009 rule, EPA explained that sources emitting 0.03 lb/MMBtu or less of particulate matter "will operate with little or no visible emissions," and thus "an opacity standard is no longer necessary for these sources." 2009 Rule, 74 Fed. Reg. at 5073. "At this emission rate," the agency said, the existence of *any* "visible emissions may indicate that the [particulate matter] control device is not operating properly." *Id.* at 5074. Hence, for a source that is meeting this emission standard, no opacity standard is needed because *any* visible opacity will indicate improper operation.

By contrast, units emitting more than 0.03 lb/MMBtu of particulate matter "may have some visible emissions" even if their particulate matter control devices are operating properly. *Id.* Since particulate matter "CEMS readings cannot be verified as readily as other CEMS, and since recalibration requires [particulate matter] performance tests, baseline opacity readings can be a valuable secondary check on control device performance and [particulate matter] emissions." *Id.* Accordingly, the agency reasonably concluded that a unit emitting more than 0.03 lb/MMBtu should remain "subject to an opacity limit" and "use a COMS or perform periodic visual inspections to comply with the opacity standard" to verify that the pollution control and monitoring systems are operating properly. *Id.*[5]

---

[5]The petitioners maintain that, in the 2012 rule, EPA renounced this rationale for subjecting boilers emitting more than 0.03 lb/MMBtu of particulate matter to an opacity standard. We disagree. The agency did add another explanation in its response to comments, but nothing in that response suggests that it renounced its earlier rationale. *See*

UARG also contends that EPA was unreasonable, not just in retaining an opacity standard for units emitting more than 0.03 lb/MMBtu of particulate matter, but also in requiring them to use a COMS or perform periodic visual opacity inspections. But as just explained, the purpose of retaining the opacity standard for such a unit is to provide a real-time check to ensure that its particulate matter control device is functioning properly. *See* 2009 Rule, 74 Fed. Reg. at 5073-74; 2008 Proposal, 73 Fed. Reg. at 33,646 n.1. Using a COMS or performing periodic visual opacity inspections provides that check. *See id.* Because EPA has articulated a reasonable explanation for requiring opacity monitoring, petitioner's challenge to this requirement fails.

We also reject UARG's related contention that EPA's action was arbitrary and capricious because it failed to address "the impacts of the periodic visible emissions testing on the Subpart D units it had proposed to exempt from the standard, but did not exempt in the final rule." Pet'rs' Br. 35. Whether or not a failure to consider the burden imposed on those units would have been arbitrary and capricious, the contention fails because EPA *did* consider the burden imposed by its visual opacity inspection requirement. *See* 2009 Rule, 74 Fed. Reg. at 5074; *see also* 2008 Proposal, 73 Fed. Reg. at 33,643 (noting that the proposal, which included visual opacity inspection requirements, "would not significantly change our original projections for the rule's compliance costs, . . . burden on industry, or the number of affected facilities"); *id.* at 33,645 (noting that "the use of a digital camera system" to comply with the opacity monitoring requirements "would also reduce compliance costs"); 2012 Rule,

---

EPA, Response to Public Comments on Rule Amendments Proposed May 3, 2011 (73 FR 33642) [hereinafter 2011 Response to Comments] at 13-14 (Dec. 2011) (J.A. 211-12).

77 Fed. Reg. at 9425 (analyzing the power industry's compliance costs).

2.  UARG further contends that, in promulgating the 2009 rule, EPA violated the Clean Air Act's rulemaking provisions. According to UARG, in 2008 "EPA proposed one rule (the full opacity exemption) based on its longstanding positions . . . , and then adopted a very different rule without any notice of its new rationale or positions." Pet'rs' Br. 31.  But even assuming that EPA did stumble procedurally during the rulemaking for the 2009 rule, it made up for any procedural error during the rulemaking for the 2012 rule.  There is no dispute that, during the latter, EPA offered all interested parties an opportunity to comment on both the opacity standard and the opacity monitoring requirements.  Because thereafter EPA re-promulgated the same standard and requirements, UARG's procedural objection to the allegedly inadequate notice and opportunity to comment is moot.  *See NRDC v. U.S. Nuclear Regulatory Comm'n*, 680 F.2d 810, 813-14 (D.C. Cir. 1982); *see also Fund for Animals, Inc. v. Hogan*, 428 F.3d 1059, 1063-64 (D.C. Cir. 2005).  So, too, is its contention that EPA failed to respond to comments on the 2008 proposal.  *See NRDC v. U.S. Nuclear Regulatory Comm'n*, 680 F.2d at 813-14.[6]

---

[6]UARG also argues that EPA violated the Paperwork Reduction Act by failing to submit to the Office of Management and Budget an information collection request to support its condensable particulate matter testing requirement.  *See* 44 U.S.C. § 3507(a).  But even if that were true, a violation of the Paperwork Reduction Act does not afford an independent cause of action; it merely serves as a defense to an enforcement action.  *See id.* § 3512; *Dithiocarbamate Task Force v. EPA*, 98 F.3d 1394, 1405 (D.C. Cir. 1996); *see also, e.g.*, *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 844 (9th Cir. 1999).  No such action is before us.

B

Texas' petition for review challenges EPA's refusal to allow state-law affirmative defenses against the enforcement of new source performance standards.

As noted earlier, *see supra* Part I, EPA's 2011 notice proposed adding an affirmative defense to civil penalties when a facility exceeds emission limits as a result of a malfunction. *See* 2011 Proposal, 76 Fed. Reg. at 25,064. EPA proposed that the defense be available only "where the event that causes an exceedance of the emission limit" is "sudden, infrequent, not reasonably preventable and not caused by poor maintenance and or careless operation." *Id.* In its comments during the rulemaking, Texas asked EPA to consider allowing states to use their own state-law affirmative defenses in lieu of the federal defense that EPA proposed. Specifically, Texas wanted to use the affirmative defense provisions in its State Implementation Plan (SIP), which EPA had previously approved under a different Clean Air Act provision, 42 U.S.C. § 7410. The 2012 final rule permitted the federal defense only.

Texas maintains that EPA did not explain why it declined to approve Texas' use of a state-specific affirmative defense for the new source performance standards under 42 U.S.C. § 7411, when it had approved such a defense in its SIP under § 7410. But EPA did explain: Unlike some other Clean Air Act standards, new source performance standards are not incorporated into SIPs as state-promulgated regulations. Rather, they are federal standards to which SIP affirmative defense provisions are inapplicable. *See* 2011 Response to Comments at 26 (J.A. 215).

Texas protests that this explanation is arbitrary and capricious because EPA suggested, in responding to comments

in a different rulemaking, that it *would* permit state-specific affirmative defenses with respect to different emission standards -- the mercury and air toxics (MATS) emission standards for coal- and oil-fired EGUs, issued pursuant to 42 U.S.C. § 7412. Although EPA's brief offers the agency's explanation for the difference (based on differences between the state-delegation aspects of the new source performance and MATS rules, *see* EPA Br. 30-32), we do not address that explanation. As we noted above, *supra* Part III (introduction), Texas did not bring this alleged inconsistency to EPA's attention until its petition for reconsideration. As a consequence, it may not raise this objection for judicial review until that petition is resolved. *See supra* Part II.A.[7]

IV

For the foregoing reasons, the petitions for review are

*Denied.*

---

[7]It does appear that Texas had good reason for not raising the point during the rulemaking: EPA's response regarding the MATS comments was not published until the public comment period for the new source performance standards rule had closed. *See* EPA's Responses to Public Comments on EPA's *National Emission Standards for Hazardous Air Pollutants from Coal- and Oil-Fired EGUs* (Dec. 2011) (J.A. 167); 2011 Proposal, 76 Fed. Reg. at 24,976 ("Comments must be received on or before July 5, 2011."). But as we explained in Part II.A, although this may qualify Texas for the limited exception to the statutory bar against raising objections not raised during a rulemaking, *see* 42 U.S.C. § 7607(d)(7)(B), the State must nonetheless wait to raise its objection until EPA acts on its petition for reconsideration. *See Oklahoma*, 723 F.3d at 1214-15; *Appalachian Power*, 249 F.3d at 1065.

KAVANAUGH, *Circuit Judge*, concurring: I join the Court's opinion. I note simply that the Section 7607 exhaustion/finality rule we describe today likely should not be considered jurisdictional under the Supreme Court's recent cases that have tightened the definition of when a rule is considered jurisdictional. *See generally Sebelius v. Auburn Regional Medical Center*, 133 S. Ct. 817, 824 (2013) ("To ward off profligate use of the term jurisdiction, we have adopted a readily administrable bright line for determining whether to classify a statutory limitation as jurisdictional. We inquire whether Congress has clearly stated that the rule is jurisdictional; absent such a clear statement, we have cautioned, courts should treat the restriction as nonjurisdictional in character.") (citations, internal quotation marks, and alteration omitted); *Gonzalez v. Thaler*, 132 S. Ct. 641, 648 (2012) ("Recognizing our less than meticulous use of the term in the past, we have pressed a stricter distinction between truly jurisdictional rules, which govern a court's adjudicatory authority, and nonjurisdictional claim-processing rules, which do not.") (internal quotation marks omitted); *Henderson ex rel. Henderson v. Shinseki*, 131 S. Ct. 1197, 1202-03 (2011) ("We have urged that a rule should not be referred to as jurisdictional unless it governs a court's adjudicatory capacity, that is, its subject-matter or personal jurisdiction. Other rules, even if important and mandatory, we have said, should not be given the jurisdictional brand.") (citations omitted).

To be sure, at least one case of ours has referred to the Section 7607 rule as jurisdictional. *See National Association of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1158 (D.C. Cir. 2013). But our statement in that case was based on a prior case that pre-dated some of the Supreme Court's more recent pronouncements on the jurisdiction label. Of course, the question of whether such a rule is jurisdictional matters only in those cases where the agency has waived or forfeited reliance on

the rule, which is to say not often. Although we do not need to address the question in this case, in an appropriate case where it makes a difference, we may want to ensure that our case law on the jurisdictional status of this particular exhaustion/finality rule has kept pace with the Supreme Court's case law on when a rule should be considered jurisdictional.