**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 21-3023 & 22-1012
_____

CENTER FOR BIOLOGICAL DIVERSITY,
Petitioner

v.

UNITED STATES ENVIRONMENTAL PROTECTION
AGENCY; ADMINISTRATOR OF THE UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY

CITY OF PHILADELPHIA;
PENNSYLVANIA DEPARTMENT OF
ENVIRONMENTAL PROTECTION,
Intervenors
_____

On Petition for Review of Actions of the
United States Environmental Protection Agency
_____

Argued:  April 13, 2023
_____

Before:  CHAGARES, <u>Chief</u> <u>Judge</u>, SCIRICA and AMBRO,
<u>Circuit</u> <u>Judges</u>

(Filed:  July 25, 2023)
_____

Alexa M. Carreno [ARGUED]
Jeremy D. McKay
Environmental and Animal Defense
501 South Cherry Street
Suite 1100
Denver, CO 80246

Counsel for Appellant

Melissa Hoffer
United States Environmental Protection Agency
Office of General Counsel
1200 Pennsylvania Avenue NW
Washington, DC 20460

Jeffrey Hughes [ARGUED]
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Ben Franklin Station
Washington, DC 20044

Counsel for Appellee

Zachary G. Strassburger
City of Philadelphia
Law Department
1515 Arch Street

Philadelphia, PA 19102

Counsel for Intervenor City of Philadelphia

Robert A. Reiley
Pennsylvania Department of Environmental Protection
Office of Chief Counsel
9th Floor
400 Market Street
Rachel Carson State Office Building
Harrisburg, PA 17101

Jesse C. Walker [ARGUED]
Office of Attorney General of Pennsylvania
Bureau of Regulatory Counsel
RCSOB 9th Floor
P.O. Box 8464
Department of Environmental Protection
Harrisburg, PA 17105

Counsel for Intervenor Pennsylvania Department of
Environmental Protection

_____

OPINION OF THE COURT
_____

CHAGARES, Chief Judge.

3

The Center for Biological Diversity (the "Center") challenges the Environmental Protection Agency's ("EPA") approval of certain air pollution control technology for use at various Pennsylvania industrial facilities. The Center argues that the EPA violated the Clean Air Act by focusing exclusively on emissions from those facilities instead of examining their impact upon air quality more generally. The Center also claims that, even if the EPA is permitted to base its approvals on an emissions-only analysis, the agency incorrectly concluded that emissions would not be increased by Pennsylvania's pollution control technologies at issue here. Because we interpret the relevant statutory provisions to permit the EPA's chosen emissions-based approach, and because the Center's alternative challenges are procedurally and substantively deficient, we will deny the Center's consolidated petitions for review.

I.

We embark first on an acronym-filled journey through this case's factual and procedural history. This dispute has its origins in the Clean Air Act, a statute meant "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population" and "to encourage and assist the development and operation of regional air pollution prevention and control programs." 42 U.S.C. § 7401(b)(1), (4). The statute directs the EPA to set and periodically revise national ambient air quality standards ("NAAQS") for certain pollutants. 42 U.S.C. § 7409(a)–(d). The NAAQS constitute air quality benchmarks toward which states must work by reducing their pollution levels. 42 U.S.C. § 7410.

Although the EPA sets the NAAQS, individual states are afforded discretion in the creation and implementation of plans to achieve the EPA's targets for reduction of air pollutants. To this end, states must at various times submit state implementation plans ("SIPs") that "specify the manner in which [NAAQS] will be achieved and maintained" within that state. 42 U.S.C. § 7407(a). The EPA then reviews whether the SIP in question meets the Clean Air Act's requirements, in which case the agency "shall" approve it. 42 U.S.C. § 7410(k)(3). A similar principle governs situations where a state revises a pre-existing SIP: the EPA "shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress . . . ." 42 U.S.C. § 7410(*l*). "Attainment" in § 7410(*l*) refers to attainment of any NAAQS, not just the one for which a SIP or SIP revision has been submitted.

The relevant pollutant here is ozone. Over the past several decades, the EPA has revised the ozone NAAQS to make it more rigorous. When such a revision is made, the EPA must assess whether a geographic area is compliant with the updated NAAQS. 42 U.S.C. § 7407(d)(1)(A)–(B). If a region does not meet the updated NAAQS, it is deemed to be in "nonattainment" and is subject to increasingly stringent requirements depending upon the severity of its air quality problems. See 42 U.S.C. § 7407(d)(1)(A). Certain states in the Northeastern United States are additionally subject to stricter ozone pollution requirements by virtue of their location in what the Clean Air Act terms the "Ozone Transport Region," a geographic area with properties that may render these states' pollution control strategies interdependent. 42 U.S.C. § 7511c.

5

Pennsylvania is both part of the Ozone Transport Region and has several areas within it that are in nonattainment with the 1997 and 2008 iterations of the ozone NAAQS. As a result, the Clean Air Act required it to submit a SIP addressing the updated 2008 ozone NAAQS. See 42 U.S.C. § 7410(a)(1)–(2). In particular, Pennsylvania's SIP was required to impose Reasonably Available Control Technology ("RACT") for pre-existing major sources of volatile organic compounds ("VOC") and nitrous oxides ("NOx"), both of which contribute to ozone formation. RACT is "the lowest emission limitation that a particular source is capable of meeting by the application of control technology that is reasonably available considering technological and economic feasibility." Sierra Club v. United States Env't Prot. Agency, 972 F.3d 290, 294 (3d Cir. 2020) (cleaned up).

In May 2016, Pennsylvania submitted its SIP to the EPA to satisfy the state's RACT planning requirements for VOCs and NOx. See 25 Pa. Code §§ 129.97–129.100 (2016). It included two types of RACT provisions: (1) "presumptive" RACT, and (2) source-specific RACT. The presumptive RACT provision, 25 Pa. Code § 129.97, establishes broad NOx and VOC emissions limits for certain types of stationary machines, such as process heaters, combustion turbines, and cement kilns. The relevant source-specific RACT provision, meanwhile, permits a facility that cannot meet the presumptive RACT requirement to propose an alternative RACT requirement specific to its facility. 25 Pa. Code § 129.99.

The EPA approved the presumptive RACT portion of Pennsylvania's SIP revision but only conditionally approved the source-specific RACT provisions. 84 Fed. Reg. 20,275. It conditioned final approval of the source-specific RACT rule

6

on "further information on specific sources." Id. Pennsylvania then proposed RACT variances to seventeen major NOx and VOC emitting facilities and submitted them to the EPA as revisions to its SIP. While these revisions were pending final EPA approval, the Center submitted comments to the agency objecting to the variances. The comments are substantively identical and read in relevant part as follows:

> The Clean Air Act [§ 7410(*l*)] "analysis" in the proposed rule is inadequate. The fact that these rules reduce NOx emissions in no way established that the reduced NOx emissions will not cause or contribute to a 2010 1-hour NOx NAAQS violation. We have modeled numerous sources of NOx emissions in the oil and gas and other industry with annual NOx emissions much lower than the sources in this RACT rule and found them to cause or contribute to 2010 1-hour NOx NAAQS violations. For example, attached is a modeling report for a well pad which caused NOx NAAQS violations. Therefore, EPA must undertake a modeling analysis of at least the following to determine if they cause or contribute to 2010 1-hour NOx NAAQS violations.

Joint Appendix ("JA") 552, 554. Additionally, the Center appended to its comments an analysis of emissions from a Colorado facility using flare control technology.

Notwithstanding the Center's objections, the EPA approved Pennsylvania's SIP revisions. It did so via two separate rules. The first rule approved Pennsylvania's SIP

7

revision containing RACT determinations at eight major NOx and/or VOC emitting facilities. 86 Fed. Reg. 48,908 (Sept. 1, 2021). The second rule contained RACT determinations for nine additional facilities. 86 Fed. Reg. 60,170 (Nov. 1, 2021). The EPA based these approvals on its view that none of the seventeen variances would increase emissions. It compared what the revised SIPs would allow with the prior emissions limits in each facility's permit and concluded that "the status quo in . . . emissions had been maintained, if not improved, and that there is no need to conduct the modeling suggested by the [Center]." 86 Fed. Reg. 48,909–12; 86 Fed. Reg. 60,171–77.

The Center subsequently submitted a petition for reconsideration to the EPA, though it only sought reconsideration of the first rule approving Pennsylvania's SIP revisions. It did not submit a petition for reconsideration in connection with the second rule. The Center's petition for reconsideration claims that the EPA erred when it concluded that certain of the source-specific RACT does not involve any NOx emissions because certain RACT used to control VOCs emits NOx. This petition for reconsideration remains pending before the EPA.

The Center now seeks this Court's review of both rules approving Pennsylvania's SIP revisions, which are the consolidated petitions before us today.

II.[1]

---

[1] We have jurisdiction to review "[a] petition for review of the Administrator's action in approving or promulgating any

8

We must uphold the EPA's approval of a SIP revision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). While our review is deferential, "the agency cannot reach whatever conclusion it likes and then defend it with vague allusions to its own expertise; instead, the agency must support its conclusion with demonstrable reasoning based on the facts in the record." Sierra Club, 972 F.3d at 298. A court must be careful, however, to avoid "substitut[ing] its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). A court must therefore defer to the agency's expertise if it can discern "a rational connection between the facts found and the choice made." Sierra Club, 972 F.3d at 298 (quoting Prometheus Radio Project v. FCC, 373 F.3d 372, 389–90 (3d Cir. 2004)).[2]

implementation plan under section 7410" of the Clean Air Act. 42 U.S.C. § 7607(b)(1).

[2] There remains an elephant in the room: whether, and to what extent, Chevron deference specifically plays a role in this analysis. See Chevron, U.S.A., Inc. v. NRDC, 467 U.S. 837 (1984). The Chevron decision requires that if "Congress has directly spoken to the precise question at issue . . . [,] the court . . . must give effect to the unambiguously expressed intent of Congress." Id. at 842–43. If, however, "the statute is silent or ambiguous with respect to the specific issue," a reviewing court must defer to the agency's interpretation if it is reasonable. Id. at 843–44. Other Courts of Appeals dealing with similar questions related to EPA approval of SIP revisions have utilized the Chevron deference framework and held in favor of the EPA by concluding that § 7410(*l*)'s use of the term

"interfere" was ambiguous and deeming the agency's interpretation of the provision to be permissible. See, e.g., Indiana v. EPA, 796 F.3d 803, 812 (7th Cir. 2015); Alabama Env't Council v. EPA, 711 F.3d 1277, 1292 (11th Cir. 2013); Kentucky Res. Council, Inc. v. EPA, 467 F.3d 986, 995 (6th Cir. 2006).

The EPA here conspicuously makes no mention of Chevron in its briefing and skirted the issue at oral argument, despite relying heavily on the foregoing Chevron-based case law to support its position. Such tiptoeing is, perhaps, not an accident. The Supreme Court recently granted a writ of certiorari in Loper Bright Enters. v. Raimondo, which presents, in part, the question of whether the Court should overrule Chevron. See No. 22-451, 2023 WL 3158352, at *1 (U.S. May 1, 2023). This follows several years of opinions in which the Court has moved away from the doctrine in its administrative law jurisprudence. See Thomas B. Griffith & Haley N. Proctor, Deference, Delegation, and Divination: Justice Breyer and the Future of the Major Questions Doctrine, 132 Yale L.J. Forum 693, 714–18 (2022) (recapping the Supreme Court's recent "retreat from Chevron"). Given the EPA's decision here to eschew reliance on this doctrine, we will look instead to the aforementioned general principles of deference inherent in arbitrary and capricious review to guide us here. See Fed. Commc'ns Comm'n v. Prometheus Radio Project, 141 S. Ct. 1150, 1158 (2021) (describing arbitrary-and-capricious review as "deferential" and observing that "[a] court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision").

### III.

The Center argues that the EPA erred in two different ways in approving Pennsylvania's SIP revisions. It claims first that the EPA's decision to consider the revisions via an emissions-based analysis — instead of examining air quality more generally — violated § 7410(*l*)'s statutory mandate. Second, the Center argues that, even if § 7410(*l*) permits the EPA to focus exclusively on emissions, the agency wrongly concluded that Pennsylvania's SIP revisions would not increase emissions. We will address these arguments in turn below.

### A.

We first examine whether the EPA acted arbitrarily and capriciously in violation of § 7410(*l*) when it used an emissions-based analysis to evaluate and approve Pennsylvania's SIP revisions. The relevant statutory language provides:

> The Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress (as defined in section 7501 of this title), or any other applicable requirement of this chapter.

42 U.S.C. § 7410(*l*). The EPA concluded that Pennsylvania's SIP revisions satisfied this language — that the revisions did not "interfere with . . . [NAAQS] attainment" — because it found that "[e]missions are not expected to increase, and will likely decrease" under the source-specific RACT the revisions imposed. 86 Fed. Reg. 48,911; see also 86 Fed. Reg. 60,173.

11

The Center, meanwhile, argues that this emissions-based analysis did not satisfy § 7410(*l*) because the statute centers on "attainment" of the NAAQS, and NAAQS are air quality, not emissions, standards. Emissions contribute to, but are not the same as, air quality; so, to the Center, "[t]he only way for EPA to know the effect on air quality that would result from the approval of a SIP would be for it to perform some analysis of ambient air quality beyond a calculation of the emissions." Center Reply at 15.

We hold that the EPA's decision to conduct an emissions-only analysis was not arbitrary and capricious. Beginning first with the relevant statutory language, § 7410(*l*) cabins its reach to only those SIP revisions that "interfere with" NAAQS attainment. Determining whether such interference will occur is an inquiry centered upon the specific relationship between the instrument doing the potential interfering (here, a SIP revision) and its effect (in this case, on air quality). Although there are many factors that generally contribute to air quality, including emissions, topography, atmospheric conditions, and smokestack composition to name a few, a particular SIP revision may only affect a subset of these variables. If that revision leaves other air quality variables unchanged, it makes sense for the EPA to eschew a comprehensive air quality analysis in favor of a tailored approach focused on the specific variables implicated by the revision. Put simply, different types of SIP revisions pose different risks of air quality interference and § 7410(*l*) permits the EPA to adjust its analysis accordingly.

The EPA's emissions-based analysis fulfilled its statutory duty here because there is no evidence in the record to suggest that Pennsylvania's SIP revisions affected, or could affect, any other air quality factor. The revisions proposed

12

certain source-specific RACT; that is, technologies that limit the level of emissions being released from a pollution source. Beyond emissions levels, the record contains no evidence of any other air quality variable that could have been affected by Pennsylvania's SIP revisions. Indeed, emissions were the sole factor upon which the Center based its objections in its comments to the EPA, and neither party has suggested in briefing or at oral argument that any other air quality variable besides emissions might change as a result of the SIP revisions. We therefore deem the EPA's decision to conduct an emissions-only assessment here to be within the "zone of reasonableness" required, given that it "reasonably considered the relevant issue[]" — emissions.[3] Prometheus, 141 S. Ct. at 1158.

The Center's proposed construction of § 7410(*l*), by contrast, reads too much into the provision's relatively narrow strictures. Nothing in § 7410(*l*) suggests that the EPA must

---

[3] Our conclusion that the EPA acted reasonably here is bolstered by the deference we owe to an agency's expertise-based factual determinations. See Sw. Pa. Growth All. v. Browner, 121 F.3d 106, 117 (3d Cir. 1997) ("A reviewing court must generally be at its most deferential when reviewing factual determinations within an agency's area of special expertise."). The EPA's decision to focus exclusively on emissions as the relevant air quality variable when analyzing whether the Pennsylvania SIP revisions "interfere[d]" with air quality is precisely such a factual determination within its area of expertise. The agency is best positioned to determine which air quality variables are implicated by, and thus must be analyzed for, a given SIP revision, and we owe that decision deference.

13

conduct an air quality analysis in every instance. Such silence weighs against concluding that the EPA's analysis was arbitrary and capricious. The Center's focus on the fact that one cannot determine air quality based on emissions alone is beside the point because, again, § 7410(*l*) does not require the EPA to assess air quality generally but rather to analyze the specific relationship between the proposed SIP revision and NAAQS attainment. This is a different, narrower inquiry with parameters that depend entirely on the nature of the SIP revision and its particular effect on air quality. The more limited nature of this inquiry comports with common sense — there is no need for the EPA to conduct a comprehensive air quality analysis if there is no evidence that other, non-emissions factors will be changed by a particular SIP revision. See Indiana v. EPA, 796 F.3d 803, 813 (7th Cir. 2015) (affirming the EPA's emissions-based analysis in part because petitioner "ha[d] not shown that the agency's conclusion [that the revision did not interfere with attainment] would have been any different" had the SIP included air quality modeling).

Section 7410(*l*) is not a one-size-fits-all provision. Just as it does not require an air quality analysis in every instance, so too could there be circumstances in which an emissions-only analysis is insufficient. To reiterate, the precise variables that must be analyzed to satisfy § 7410(*l*) necessarily depend on the nature of the SIP revision in question and the particular interference risk it poses.[4] Some revisions may include

_____

[4] The EPA explicitly recognized as much in its rulemaking approving the Pennsylvania SIP revisions, in which it observed that "the level of rigor needed for any [§ 7410(*l*)] demonstration will vary depending on the nature and circumstances of the revision" before explaining in detail why

14

changes that affect different aspects of the air quality equation instead of, or in addition to, emissions. The record here suggests that emissions were the sole air quality variable implicated by Pennsylvania's SIP revisions. It was therefore not arbitrary or capricious under § 7410(*l*) for the EPA to use an emissions-based analysis here.[5]

B.

The Center argues in the alternative that, even if § 7410(*l*) permitted the EPA to use an emissions-based approach to analyze Pennsylvania's SIP revisions, the agency acted

---

it settled on its emissions-based approach here. 86 Fed. Reg. 48,910. This is further evidence that the EPA here has "considered the relevant issues and reasonably explained the decision" and thus has not acted arbitrarily or capriciously. See Prometheus, 141 S. Ct. at 1158.

[5] In so holding, we join several other Courts of Appeals that, in similar but not identical contexts, affirmed the EPA's use of emissions-based analyses to evaluate SIPs. See, e.g., Indiana, 796 F.3d at 812-13; WildEarth Guardians v. EPA, 759 F.3d 1064, 1073–74 (9th Cir. 2014); Alabama Env't Council, 711 F.3d at 1292; Ky. Res. Council, 467 F.3d at 995. Most of these courts, as previously noted, held the agency's emissions-based approach to be permissible based on Chevron deference. The sole exception is WildEarth Guardians, in which the Court of Appeals for the Ninth Circuit recognized, as here, that "nothing in [the SIP at issue] weakens or removes any pollution controls. And even if the [SIP] merely maintained the status quo, that would not interfere with the attainment or maintenance of the NAAQS." 759 F.3d at 1074.

15

arbitrarily and capriciously by concluding that those revisions did not increase emissions. First, the Center contends that the EPA compared those revisions' changed emissions levels to the wrong emissions baseline; failure to use the appropriate baseline — presumptive RACT — meant that the EPA erroneously approved SIP revisions that increased emissions. Second, the Center claims that certain of the control technologies approved by the EPA emit NOx pollutants of their own, leading to increased emissions that were not accounted for in the agency's analysis. Both arguments fall short for the reasons explained below.

1.

Recall that Pennsylvania's initial SIP included (1) presumptive RACT that would apply as the default technology standard for certain NOx and VOC pollution sources, and (2) separate provisions allowing facilities to propose their own source-specific RACT variances for their particular facility or group of facilities. The Center claims that the emissions limits associated with the presumptive RACT constituted the baseline to which the EPA should have compared Pennsylvania's subsequent source-specific RACT variances. The EPA did not use the presumptive RACT baseline and instead used emissions limits contained in the previously applicable permits for those various facilities. In the Center's view, this led the agency to approve certain control technologies that resulted in higher levels of emissions than would be permitted under the presumptive RACT, in violation of § 7410(*l*).

The Center's argument as to the presumptive RACT baseline falls short in light of the plain language of the Pennsylvania regulatory scheme. Pennsylvania's revised SIP,

16

as previously noted, contemplates multiple ways in which pollution sources within the state can implement RACT. The first part of the relevant language, enshrining presumptive RACT as the Pennsylvania emissions control technology standard for many NOx and VOC sources, provides:

> (a) a source . . . located at a major NOx emitting facility or major VOC emitting facility . . . shall comply with the applicable presumptive RACT requirement . . . beginning with the specified compliance date as follows, unless an alternative compliance schedule is submitted and approved under . . . § 129.99 . . . .

25 Pa. Code § 129.97. The associated provision § 129.99 provides in relevant part that:

> (a) the owner or operator of an air contamination source subject to 129.97 . . . located at a major NOx emitting facility or major VOC emitting facility . . . that cannot meet the applicable presumptive RACT requirement . . . may propose an alternative RACT requirement . . . .

25 Pa. Code § 129.99.

Read together, these provisions demonstrate that presumptive RACT cannot be the emissions baseline. The purpose of § 129.99's self-described "alternative RACT requirement" carve-out from § 129.97's presumptive RACT baseline is that the facilities subject to § 129.99 "cannot meet the applicable presumptive RACT requirement." Id. (emphasis added). In other words, the applicable portion of § 129.99 only permits facilities that cannot comply with presumptive RACT to obtain the sort of source-specific, case-by-case RACT

17

determinations that the Center challenges here. It would make little sense, then, to hold those same facilities to the very presumptive RACT baseline that the statute contemplates them being unable to meet. See Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."). It was therefore not arbitrary or capricious for the EPA to use prior permitting standards, instead of presumptive RACT, as the emissions baseline for its § 7410(*l*) comparative emissions analysis.

2.

The Center's final argument is that the EPA acted arbitrarily and capriciously when it concluded that certain of Pennsylvania's proposed emissions control technologies do not emit NOx. It claims, specifically, that some of the EPA-approved technologies that limit VOC emissions actually emit NOx pollutants in the process, and that the EPA failed to account for these emissions in its analysis. But before we can reach the merits, we must examine the procedural hurdles affecting our ability to consider this aspect of the consolidated petitions for review.

First, the Center forfeited its challenge here since neither of its comments to the EPA mentioned the risk of Pennsylvania's source-specific RACT increasing NOx emissions. See Sw. Pa. Growth. All. v. Browner, 121 F.3d 106, 112 (3d Cir. 1997) ("Generally, federal appellate courts do not consider issues that have not been passed on by the agency . . . whose action is being reviewed.") (cleaned up); see generally Barna v. Bd. of Sch. Directors of Panther Valley Sch. Dist.,

18

877 F.3d 136, 140 (3d Cir. 2017). The Center, however, claims that it preserved the NOx emissions argument via computer modeling data that it referenced in and attached to its comments. The modeling shows that flares, a control technology for VOC emissions that was not used in Pennsylvania's SIP revisions, created NOx violations. Such an indirect reference to the risk of increased NOx emissions from VOC control technology does not suffice to prevent forfeiture here because it does not meet 42 U.S.C. § 7607(d)(7)(B)'s requirement that an objection to an agency's rule be raised "with reasonable specificity" in order to be preserved for judicial review. An objection like this — raised by implication only, via a tangentially related study attached to a comment that otherwise makes no mention of the objection in question (and in fact could be read to accept that NOx emissions would be reduced) — does not satisfy the "reasonable specificity" requirement because it cannot be deemed to have alerted the agency to the alleged increased NOx emissions. See Tex Tin Corp. v. EPA, 935 F.2d 1321, 1323 (D.C. Cir. 1991) ("An objection must be made with sufficient specificity reasonably to alert the agency.").

Second, we must consider the effect of the Center's petition for reconsideration currently pending before the EPA, which asks the agency to revisit the first of its two rules approving Pennsylvania's SIP revisions. That petition for reconsideration for the first time directly and explicitly alerts the agency to the Center's concerns that some of Pennsylvania's proposed VOC control technology itself emits NOx. The petition for reconsideration's pending status limits our ability to review part of the Center's argument. A court may not consider matters raised for the first time in a petition for reconsideration while that petition remains pending before

19

the relevant agency. Util. Air Regul. Grp. v. EPA, 744 F.3d 741, 747 (D.C. Cir. 2014) ("Objections raised for the first time in a petition for reconsideration must await EPA's action on that petition."). Because the EPA has not yet resolved the Center's petition for reconsideration, we cannot review the Center's claims pertaining to NOx emissions from VOC control technologies raised for the first time within it.

Procedural considerations prevent us from reviewing the merits of the Center's claim that the EPA erroneously approved certain VOC control technologies that release NOx emissions.[6] We thus hold that, for each facility covered by the

_____

[6] We cannot, however, ignore the agency's admission of error with respect to one Pennsylvania facility in particular: the Roystone Compressor Station ("Roystone"). The EPA admits that it approved the use of a thermal oxidizer at Roystone to limit VOC emissions that does increase NOx emissions, even though the agency's approval stated that there were no NOx emissions from the proposed RACT at the facility. This error is undoubtedly concerning. The EPA's thorough identification and consideration of each air quality variable implicated by a given SIP revision is a key prerequisite of a reasonable § 7410(*l*) analysis — otherwise, it cannot accurately ascertain whether the revision will "interfere with . . . [NAAQS] attainment," as the statute requires. An emissions-based assessment that accounts only for the emissions being controlled by the relevant technology and not for the emissions being released by the control process itself could indicate that the agency may have "entirely failed to consider an important aspect of the problem." See Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43. Fortunately, consideration of the Roystone station

20

petition for reconsideration presently pending before the EPA, the Center's petition for review is denied without prejudice to any subsequent objections resulting from the EPA's resolution of the reconsideration process. As for the remainder of the facilities not covered by the petition for reconsideration, we hold that the Center has forfeited its claim by failing to raise its concerns regarding NOx emissions from VOC control technologies with reasonable specificity; its petition for review will therefore be denied as to these facilities as well.

## IV.

For the foregoing reasons, we will deny the Center's consolidated petitions for review.

---

remains pending before the EPA as part of the Center's petition for reconsideration.