# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2582

STATE OF MICHIGAN,

*Petitioner*,

*v.*

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

*Respondent,*

and

FOREST COUNTY POTAWATOMI
COMMUNITY,

*Intervenor-Respondent.*

Petition for Review of the
Final Administrative Rulings of the
United States Environmental Protection Agency.

ARGUED MARCH 30, 2009—DECIDED SEPTEMBER 9, 2009

Before KANNE, WOOD and WILLIAMS, *Circuit Judges.*

WOOD, *Circuit Judge.* The cultural and religious tradi-
tions of the Forest County Potawatomi Community ("the
Community") often require the use of pure natural re-

sources derived from a clean environment. Many years ago, the Community became alarmed by increasing pollution levels in its lakes, wetlands, and forests. To remedy this problem, it submitted a request to the Environmental Protection Agency ("EPA") to redesignate certain tribal lands from Class II to Class I status under the Prevention of Significant Deterioration ("PSD") program of the Clean Air Act ("the Act"). This would have the effect of imposing stricter air quality controls on emitting sources in and around the Community's redesignated lands.

After nearly fifteen years of administrative proceedings and dispute resolution efforts between the Community and neighboring Wisconsin (which were successful) and Michigan (which were not), the EPA promulgated a final ruling redesignating the Community's lands to Class I status. It also issued two companion announcements concluding dispute resolution proceedings with Wisconsin and Michigan. Michigan seeks review of these three final administrative rulings. It asserts that the EPA pursued the redesignation in an improper manner and, as a result, needlessly complicated Michigan's air quality control programs. Because Michigan lacks standing to pursue these claims, we dismiss its petition for review.

# I

## A

The Act, 42 U.S.C. §§ 7401-7617q, establishes a comprehensive program for air quality control and authorizes

the EPA to administer it. 42 U.S.C. § 7601(a)(1). Under the Act, the EPA must identify air pollutants that endanger public health and welfare and must formulate National Ambient Air Quality Standards ("NAAQS"), which specify air quality criteria, control techniques, and the maximum possible concentration of various air pollutants. 42 U.S.C. §§ 7408-09.

The purpose of the PSD program is to preserve the NAAQS where they have been met. 42 U.S.C. § 7471. It operates primarily through a permitting system. A "major emitting facility," defined at 42 U.S.C. § 7479(1), must obtain a permit before initiating construction of a new facility or modifying an existing facility. 42 U.S.C. § 7475(a)(1). In order to secure such a permit, the emitting source must demonstrate through air quality modeling that it will not cause or contribute to the

> (A) maximum allowable increase or maximum allow-able concentration for any pollutant in any area to which this part applies more than one time per year, (B) national ambient air quality standard in any air quality control region, or (C) any other applicable emission standard or standard of performance under this Act.

42 U.S.C. § 7475(a)(3). Under the PSD program, an area is designated as Class I, II, or III, with Class I lands being those for which air quality is most protected. 42 U.S.C. § 7473. Thus, it is more difficult for emitting sources in the vicinity of a Class I area to obtain a PSD permit.

Much of the PSD program is implemented by the States through State Implementation Plans ("SIP"), which

contain a set of State-promulgated and EPA-approved regulations. 42 U.S.C. § 7410. If a State has not yet promulgated its own SIP, or if the EPA has not approved a proposed SIP, the EPA will issue a Federal Implementation Plan ("FIP"), which will govern the implementation of the PSD program until the State creates a valid SIP. 42 U.S.C. § 7410(c). Indian Tribes are generally treated the same as States under the Act (with some exceptions noted in 40 C.F.R. § 49.4). This means that they may implement the PSD program on their lands through a Tribal Implementation Plan ("TIP"), which is analogous to a SIP. 42 U.S.C. § 7601(d). Just as with States, if a Tribe does not create a valid implementation plan, the EPA will promulgate a FIP to govern the tribal lands until the Tribe creates a valid TIP, if and when it wishes to do so. 40 C.F.R. § 49.11.

Both a State and a Tribe are authorized to redesignate land within their boundaries to Class I status. 42 U.S.C. § 7474(a), (c). Redesignation requires that the State or Tribe hold public hearings and analyze the "health, environmental, economic, social, and energy effects of the proposed redesignation." 42 U.S.C. § 7474(b)(1)(A). If these procedural requirements are met, the EPA has little discretion in denying a redesignation. See *Arizona v. EPA*, 151 F.3d 1205, 1208 (9th Cir. 1998) ("Once these procedural requirements are met, EPA must approve the request for redesignation."). A State, however, may object to a proposed tribal redesignation and invoke dispute resolution under 42 U.S.C. § 7474(e). The EPA must accept whatever agreement the State and Tribe come to, but if they cannot come to an agreement, the EPA may

resolve the issue and integrate it into the relevant SIP, TIP, or FIP. *Id.*

The EPA is charged with administering the permitting process for the PSD program, but it may delegate that authority. See 40 C.F.R. § 52.21(u). It has done so in this case by entrusting PSD permitting authority to the Michigan Department of Environmental Quality for sources within the State of Michigan. See Approval and Promulgation of Implementation Plans; Delegation of Authority to the State of Michigan, 45 Fed. Reg. 8,348 (Feb. 7, 1980).

B

The Community is a federally-recognized Indian Tribe in Wisconsin. See Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs, 73 Fed. Reg. 18,553, 18,554 (Apr. 4, 2008). It inhabits an area rich in lakes, wetlands, and forests, and it sees the preservation of these lands as crucial to its cultural heritage. For example, the Community's belief system requires that plants and animals that are used for medicines and religious ceremonies be obtained in a pure form from a clean environment. With increasing pollution, the Community saw its heritage threatened, and so it decided to ask the EPA to redesignate certain of its reservation lands from Class II to Class I status.

On December 7, 1993, the Community submitted to the EPA an informal request for redesignation of its reservation lands within Forest County, Wisconsin. The Com-

munity gave notice to various entities of the public hearings it held on the subject, and it also submitted a Technical Report to the EPA, outlining the various effects of the redesignation. On February 14, 1995, the Community submitted its formal request for redesignation to the EPA. The EPA reviewed the Community's materials and determined that the procedural requirements for redesignation had been met. Thus, on June 29, 1995, the EPA issued a Notice of Proposed Rulemaking that suggested approval of the redesignation request and sought public comment. Because of the proposed redesignation's effect on emitting sources in surrounding lands, Michigan and Wisconsin objected to the proposed change and invoked the dispute resolution provisions of 42 U.S.C. § 7474(e). The Community-Wisconsin negotiations ended successfully with the signing of a Memorandum of Agreement ("MOA"). In contrast, the Community-Michigan dealings broke down, and the Community requested that the EPA resolve the dispute.

On December 18, 2006, the EPA again issued a Notice requesting comments on a proposed rule that would approve the Community's proposed redesignation and implement it through a FIP promulgated by the EPA. After public hearings and an extended comment period, the EPA promulgated its final action redesignating the Community lands to Class I status on April 29, 2008. See Approval and Promulgation of Air Quality Implementation Plans; Wisconsin; Redesignation of the Forest County Potawatomi Community Reservation to a PSD Class I Area, 73 Fed. Reg. 23,086 (Apr. 29, 2008). The EPA also issued two companion announcements concluding the dispute

resolutions with Wisconsin and Michigan. The Wisconsin dispute resolution action incorporated the MOA, which exempted certain Wisconsin lands from Class I restrictions. See Redesignation of the Forest County Potawatomi Community Reservation to a PSD Class I Area; Dispute Resolution With the State of Wisconsin, 73 Fed. Reg. 23,111, 23,114 (Apr. 29, 2008) (subjecting only "major sources in Wisconsin located within a ten (10) mile radius of any redesignated Tribal land to performing an increment analysis and to meeting consumption requirements applicable to a Class I area."). The EPA's approval of Class I status for the tribal lands will affect emitting sources within Michigan. See Redesignation of the Forest County Potawatomi Community Reservation to a PSD Class I Area; Dispute Resolution with the State of Michigan, 73 Fed. Reg. 23,107 (Apr. 29, 2008). Michigan seeks review of these three final administrative rulings.

## II

As the party invoking federal jurisdiction, Michigan bears the burden of demonstrating that it has standing, which has three requirements:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independ-

> ent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations omitted); *Citizens Against Ruining the Env't v. EPA*, 535 F.3d 670, 675 (7th Cir. 2008). Michigan challenges the EPA's final actions on three grounds. First, it believes that the EPA used an improper procedural vehicle for redesignating the Community lands. Second, it argues that the EPA acted punitively by applying more stringent restrictions to Michigan than to Wisconsin. Third, it contends that the EPA did not provide sufficient regulatory guidance in its final actions. We review each of these arguments below.

Michigan's primary complaint is that the EPA used the wrong process to redesignate the Community's lands to Class I status. Specifically, Michigan believes that the EPA should have required the Community to promulgate a TIP. The parties agree that a TIP was never created, but they disagree about whether a TIP was necessary and whether the regulations codified at 40 C.F.R. § 52.21 constitute a valid FIP governing the Class I area. We do not reach the merits of these arguments at this stage, however, because Michigan may not establish standing by simply identifying a procedural defect in the redesignation process. See *Summers v. Earth Island Inst.*, 129 S. Ct. 1142, 1151 (2009) ("deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right in *vacuo*—is insufficient to create Article III standing").

In order to connect the perceived procedural defect to cognizable injuries for standing purposes, Michigan asserts various harms that flow from the redesignation. The first of these alleged injuries is the EPA's imposition of stricter requirements on emitting sources in Michigan than in Wisconsin. Michigan characterizes this as the EPA's retaliating against Michigan for pursuing its legal challenge to the redesignation.

It is true that, as a result of the MOA, fewer sources in Wisconsin are subject to Class I restrictions than would otherwise be the case. See Dispute Resolution With the State of Wisconsin, 73 Fed. Reg. at 23,114. Wisconsin's treatment, however, is the result of the successful negotiations between it and the Community, and the EPA does not typically interfere with such agreements. See Federal Implementation Plan Under the Clean Air Act for Certain Trust Lands of the Forest County Potawatomi Community Reservation if Designated as a PSD Class I Area; State of Wisconsin, 71 Fed. Reg. 75,694, 75,696 (Dec. 8, 2006) ("[W]here the parties successfully reach agreement through the dispute resolution process, EPA is inclined to read section 164(e) of the Act to provide that EPA has no further role to play in the dispute resolution process."). Michigan had access to the very same dispute resolution opportunity, but it failed to come to an agreement with the Community. That meant that the EPA was obliged to resolve the dispute. 42 U.S.C. § 7474(e). It did so by imposing on Michigan's emitting sources the standard Class I restrictions, which are the same restrictions that apply to emissions that will reach any Class I area, whether it is within Michigan

(as some are) or any other state or tribal land. Far from being punitive, this is the normal effect of a Class I redesignation. If Michigan objects to these consequences, it should pursue its dispute with Congress, not the courts. There is no cognizable injury here.

Even assuming injury, it is doubtful that Michigan is the injured party. There is no evidence in this record indicating that the new restrictions affect Michigan directly; rather, they affect emitting sources *within* Michigan that want to construct new facilities or modify existing ones. These sources form part of Michigan's economy, and thus the redesignation affects Michigan's economic interests. Traditionally a State may sue based upon such interests by invoking the doctrine of *parens patriae*. That option is not available here, however, because a State may not use that doctrine to sue the United States. See *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923) ("It cannot be conceded that a State, as *parens patriae*, may institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof. . . . In that field it is the United States, and not the State, which represents them as *parens patriae*, when such representation becomes appropriate; and to the former, and not to the latter, they must look for such protective measures as flow from that status."). Nor can Michigan invoke the "special solicitude" afforded to States for standing purposes when there is a quasi-sovereign interest at stake. See *Massachusetts v. EPA*, 549 U.S. 497, 520-23 (2007). In contrast to that case, in which Massachusetts's coastal lands were threatened by rising sea levels, Michigan's air can only benefit from the redesignation of Community lands to Class I status.

Michigan also alleges injury by claiming that the redesignation creates "numerous complications and unworkable conflicts" in its air pollution programs. Michigan cites the EPA's lack of regulatory guidance on a range of topics, including the relevant Air Quality Related Values ("AQRVs") for the Class I area as well as the radial distance from the Class I area that Michigan should consider in evaluating permit applications. It also complains that it does not know the identity of the federal land manager ("Manager") for the Community's Class I area.

As a preliminary matter, these issues appear to be outside the scope of our review. Nowhere in the Act or its corresponding regulations is the requirement that AQRVs, radial distances, or the identity of Managers be published as a prerequisite to redesignation. See 42 U.S.C. § 7474; 40 C.F.R. § 52.21(g). Thus, these alleged harms do not seem germane to the challenge Michigan makes here to the EPA's final redesignation actions. Even if they were, Michigan would lack standing because it would be unable to show redressability. There is no reason to think that a TIP, Michigan's preferred procedural vehicle for redesignation, would include this type of regulatory guidance while a SIP or the EPA's existing FIP do not. Nonetheless, we briefly discuss Michigan's concerns below.

Michigan's uncertainty regarding key parts of the permitting process is understandable. The EPA has not yet published final guidance on a series of topics related to the permitting process, although proposed rules and

unofficial guidance do exist. See Prevention of Significant Deterioration (PSD) and Nonattainment New Source Review (NSR), 61 Fed. Reg. 38,249 (July 23, 1996); EPA NEW SOURCE REVIEW WORKSHOP MANUAL DRAFT (1990) E.1-E.24. Beyond these materials, Michigan also has access to additional regulatory guidance. A lengthy set of PSD regulations governs the Community Class I area. See 40 C.F.R. § 52.21. In its reply brief, Michigan withdrew its challenge to these regulations, which was wise, as we would not have jurisdiction to review them. See 42 U.S.C. § 7607(b)(1) ("nationally applicable regulations promulgated, or final action taken, by the Administrator under this Act may be filed only in the United States Court of Appeals for the District of Columbia").

In addition, as Michigan knows from its experience with nearby Class I areas, such as the Boundary Waters Canoe Area Wilderness in Minnesota, 40 C.F.R. § 81.415, and the Seney Wilderness Area in Michigan's own Upper Peninsula, 40 C.F.R. § 81.414, the issues it raises are often hashed out in the context of the application process for a particular permit and frequently involve a series of cooperative arrangements. See Bernard F. Hawkins, Jr. & Mary Ellen Ternes, *The New Source Review Program: Prevention of Significant Deterioration and Nonattainment New Source Review*, in THE CLEAN AIR ACT HANDBOOK 131, 171 (Robert J. Martineau, Jr. & David P. Novello eds., 2nd ed. 2004) (noting that a permit applicant should consult with the permitting agency and Managers to determine potentially affected Class I areas and relevant AQRVs). Thus, while the general lack of

regulatory guidance is a concern in this area, Michigan's challenge comes at the wrong point in the process.

Michigan's concern about the identity of the Manager derives from its statutory duty to provide

> notice of the permit application to the Federal Land Manager and the Federal official charged with direct responsibility for management of any lands within a class I area which may be affected by emissions from the proposed facility.

42 U.S.C. § 7475(d)(2)(A). If it cannot provide notice to the relevant Managers, then it may be open to a citizen suit under the Act. See 42 U.S.C. § 7604(a) ("any person may commence a civil action on his own behalf . . . against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this Act which is not discretionary with the Administrator").

But closer inspection reveals that this concern is unfounded. The identity of the Manager is determinable from the existing regulations that govern the Community's Class I area. 40 C.F.R. § 52.21(b)(24) specifically defines the Manager as "the Secretary of the department with authority over such lands." For the mandatory Class I areas established by 42 U.S.C. § 7472(a), such as parks, wilderness areas, and forests, the Managers are the Department of Interior's National Park Service and Fish and Wildlife Service, and the Department of Agriculture's Forest Service. 40 C.F.R. §§ 81.400 *et seq.* For the Community Class I area, the Manager appears to be the EPA itself, as it currently administers the regulations at

40 C.F.R. § 52.21 governing the Community Class I area. Once the Community promulgates a valid TIP (if it chooses to do so), the EPA may delegate managerial responsibilities to it. Such a move would be consistent with the EPA's own policies towards Indian Tribes. See EPA POLICY FOR THE ADMINISTRATION OF ENVIRONMENTAL PROGRAMS ON INDIAN RESERVATIONS 2 (1984) (reaffirmed in 2005) ("Until Tribal Governments are willing and able to assume full responsibility for delegable programs, the Agency will retain responsibility for managing programs for reservations."). Until the EPA delegates managerial responsibilities to the Community, Michigan may fulfill its statutory duty to provide notice to the Community Class I area Manager by notifying the EPA of any relevant permit application.

* * *

The Community has waited over fifteen years for finality on the redesignation of its lands. Michigan's challenge to the EPA's redesignation actions raises some important issues about the PSD program's regulatory structure, but Michigan has failed to allege a cognizable injury in fact and thus lacks standing to pursue this case. As a result, the Community need not wait any longer.

We DISMISS the petition for review.